**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

NANCY MEAD,                                                    Case No. 1:13-cv-920

                   Plaintiff,                                 Barrett, J.
v.                                                                   Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Nancy Mead filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. The Commissioner filed a response, to which Plaintiff filed no reply. As explained below, the ALJ's finding should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

**I. Background**

Born in 1973, Plaintiff remained in the "younger individual" age category of 18-49 from the time she first applied for both disability insurance benefits ("DIB") and for supplemental security income ("SSI") in January 2010, through the date of the Commissioner's last decision. She has a high school education and is able to communicate in English. (Tr. 26).

In her applications, Plaintiff alleged a disability onset date of April 12, 2007, based primarily upon the combined effects of a cardiac condition and depression and anxiety. Those claims were denied initially and upon reconsideration, following which

Plaintiff sought an evidentiary hearing. A hearing was held on May 3, 2011, at which Plaintiff appeared with counsel and presented testimony. Plaintiff's husband and a vocational expert also testified. (Tr. 34-83). Following the hearing, on June 30, 2012, Administrative Law Judge ("ALJ") Larry Temin filed a written decision in which he determined that, despite several severe impairments, Plaintiff remained capable of full-time employment and therefore was not disabled. (Tr. 15-28). The Appeals Council denied further review, leaving the ALJ's decision as the Commissioner's last decision.

In his decision, ALJ Temin determined that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date, and that she had severe impairments of neurocardiogenic syncope/postural orthostatic tachycardiac syndrome ("POTS"), status-post pacemaker implant in 1999; myalgias and myositis, an affective disorder, and an anxiety disorder. (Tr. 17). However, he found that Plaintiff's severe impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, a determination that Plaintiff does not challenge here. (*Id.*). Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") for a limited range of light work, as follows:

> She can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for 6 hours in an eight-hour workday and sit for 6 hours in an eight-hour workday. She can only occasionally stoop, kneel, crouch, or climb ramps or stairs. She cannot crawl, use vibratory tools or power tools, operate automotive equipment, or climb ladders, ropes, or scaffolds. She cannot work at unprotected heights or around hazardous machinery. The claimant is able to remember and carry out detailed but uninvolved instructions. She is able to sustain concentration and attention for two hours at a time, and then requires a rest break of five minutes. She cannot interact with the general public. She is limited to work that does not require more than superficial interaction with supervisors or coworkers. She is limited to work that does not require strict production quotas or more than ordinary and routine changes in the work setting or duties.

(Tr. 20-21). Based upon additional testimony provided by the vocational expert, the ALJ

2

found that Plaintiff could not perform her past relevant work as a receptionist, medical assistant, or scheduling clerk. (Tr. 26). Nevertheless, he found that she still could perform jobs that exist in significant numbers in the local and national economy, including that of housekeeper/cleaner, inspector, hand packer, assembler, and hand packager. (Tr. 27). For that reason, he found that Plaintiff had not been under a disability between April 12, 2007 and the date of his decision. (*Id.*).

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Specific Errors

### 1. Standards Applicable to Medical Opinion Evidence

Plaintiff first argues that the ALJ improperly weighed the medical opinion evidence by giving "little weight" to the opinion of her treating cardiologist, Dr. Schloss, as well as to the opinion of a psychological consultant, Dr. Schmidtgoessling. In contrast, the ALJ gave "great weight" to the opinions of several non-examining

4

consultants.

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)).  Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."  *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

### a. Dr. Schloss

Dr. Schloss has been Plaintiff's cardiologist since 1999, when he performed surgery to install a pacemaker in order to relieve her symptoms of neurocardiogenic syncope.  On February 15, 2012, Dr. Schloss provided a narrative report to Plaintiff's primary care physician (Dr. Saunders) and completed a residual functional capacity form in which he reported "ongoing (cardiac) problems and disability related to her fibromyalgia." (Tr. 942).  However, he also indicates in his narrative report that he had not seen Plaintiff for "about two years" and that on her last visit "she was doing

5

reasonably well." (Tr. 942). His report reflects that Plaintiff's symptoms only worsened "over the last several months" due to the development of "significant problems with tachycardia." (*Id.*). Dr. Schloss indicates that Plaintiff's recent worsening of tachycardia symptoms is her main complaint and the basis for her disability claim, in combination with the "fibromyalgia" that had been diagnosed and was being treated by the primary care physician. (Tr. 943). In the RFC form, Dr. Schloss opines that "stress" brings on Plaintiff's tachycardia, near syncope, nausea and pain, and that she is incapable of even low stress jobs as a result. (Tr. 779). He opines that she can walk about one city block, but that she cannot sit for more than 15 minutes at a time, or stand for more than 5 minutes at a time, that her legs should be elevated with prolonged sitting and that she can never lift 10 pounds or more, and only "rarely" lift less than 10 pounds. (Tr. 781-782). He also opines that she can "never" twist, stoop, crouch, climb ladders or stairs, or be exposed to extreme temperatures, wetness, humidity, fumes, odors, dusts, gases, or other hazards such as machinery or heights. (Tr. 782). Last, he opines that she will miss more than four days of work per month. (Tr. 783).

In contrast to Dr. Schloss's stated reliance in part on Plaintiff's "disability related to her fibromyalgia" as diagnosed by the primary care physician (Tr. 942), the ALJ found no medical evidence "to substantiate such a diagnosis." (Tr. 18, 23). The ALJ noted that, notwithstanding the primary care physician's initial diagnosis, the rheumatologist to whom Plaintiff was referred in March 2012 did not indicate that diagnosis but rather, found pain consistent with myalgias and myositis. (Tr. 18). The ALJ found that Plaintiff has a non-disabling level of pain from those two conditions and not fibromyalgia.

The ALJ did not give controlling weight to the opinions of Dr. Schloss because they were not well supported by Dr. Schloss's own records or by other clinical records.

6

In addition, the ALJ pointed out that Dr. Schloss's opinions were inconsistent with other substantial evidence in the record as a whole. Therefore, the ALJ gave the opinions "[l]ittle weight." (Tr. 24). The ALJ acknowledged that Plaintiff has a severe cardiac condition and a long treating relationship with Dr. Schloss. However, on the whole, the records reflected that the pacemaker implanted in 1999 when Plaintiff was 25 years old was successful in treating Plaintiff's condition. Prior to discussing Dr. Schloss's opinions specifically, the ALJ thoroughly reviewed Plaintiff's entire cardiac history, as well as her work history. Plaintiff worked successfully through 2007 when the record suggested she quit work primarily due to the impending birth of a child, and the records since that date did not support the type of disabling limitations indicated by Dr. Schloss.

After reviewing the lengthy list of extreme and debilitating limitations that Dr. Schloss indicated on his RFC form, the ALJ explained the lack of support in Dr. Schloss's own clinical records.

> The record reflects that the doctor had a regular treating relationship with the claimant prior to April 2009 at which time he saw her two to three times a year during regular follow up appointments. At that time, treatment records reflect the claimant was doing well and that her symptoms were generally well controlled. Between April 2009 and October 2011, the claimant had only two additional cardiac appointments, neither of which was with Dr. Schloss, and during such appointments, the providers did not note any significant concerns with regard to the claimant's condition. It was not until February 2012, after a nearly three year period, that the claimant reconnected with Dr. Schloss. At that time, the claimant reported increased symptoms and significant problems with tachycardia, though she had only been medically treated for such condition on one occasion since April 2009. In addition, it was noted that though the claimant experienced occasional lightheadedness, she had not experienced true syncope in some time. Despite the lack of regular medical care as well as the lack of objective medical findings or physical exam findings that substantiated the extent of the claimant's subjective complaints, the doctor set forth a number of significant work related limitations as noted above. This lack of care and lack of objective medical evidence significantly decreases the credibility and reliability of the restrictions set forth by Dr. Schloss. In addition, such restrictions are not supported by the claimant's ability to perform daily activities or the overall

7

> evidence. Notably, though significant limitations on her ability to sit, stand, walk, lift, and carry are alleged, she is generally the sole caretaker for two young children. She is able to also deal with the stress of such duties despite allegations that she is incapable of even low stress work. In addition, given that there is no objective medical evidence to support such limitations, they are likely based on the claimant's subjective complaints. Further, the doctor's opinions regarding the need for unscheduled breaks and frequent absences are highly speculative and not supported by any medical evidence. …The undersigned left the record open for 14 days after the hearing to allow the claimant's representative to obtain clarification from Dr. Schloss as to the inconsistency between the statements in the cardiology treatment notes and his opinion…. However, nothing was submitted, nor did the representative request an extension of time in which to submit a [response].

(Tr. 25).

As reflected in the ALJ's opinion, in the course of the hearing, while discussing the alleged severity of episodes of postural tachycardia that Plaintiff claims to experience, counsel offered to "send some more information …after the hearing.")(*See* Tr. 63, ALJ's comment, "When I look at Dr. Schloss's records I don't really see many episodes"). Later in the same hearing, counsel again responded to the ALJ's questions by stating, "I will have the cardiologist address your concerns [through a post-hearing supplement], that's probably the easiest way to handle this.")(Tr. 75). However, no additional records were forthcoming, leaving Dr. Schloss's opinions unsupported.

Plaintiff now disputes the grounds cited by the ALJ for discounting Dr. Schloss's opinions. Plaintiff argues that "it is Plaintiff's continued episodes of near syncope and her episodes of tachycardia which continue to be significantly functionally limiting, even after her pacemaker was implanted." (Doc. 10 at 7-8). However, the undersigned finds substantial evidence to support the ALJ's conclusion that neither condition was at a disabling level of severity. In her Statement of Errors, Plaintiff cites to evidence in Dr. Schloss's records that <u>pre-dates</u> her alleged onset of disability in 2007, at a time she was still employed. Plaintiff also cites to a 2009 note documenting a single

8

"exacerbation in her near syncopal episodes" that included tachycardia. But citing the same note, the ALJ reasonably concluded that the single episode did not support Dr. Schloss's disabling limitations.

Finally, Plaintiff points to an episode in January 2012 in which she sought emergency room treatment for her tachycardia, the month prior to Dr. Schloss's opinions. It was apparently that episode which led her to seek additional treatment from Dr. Schloss after a two or three year absence. The same incident appears to have prompted the remark in Dr. Schloss's February 2012 narrative report that Plaintiff's tachycardia had worsened "over the last several months" (Tr. 942), and led him to prescribe new treatment with beta-blockers which he planned to "titrate further upward as necessary as an out-patient" in order to alleviate her recent symptoms. However, there is no record of follow-up either with Dr. Schloss or with the specialist in tachycardia to whom he referred Plaintiff to explore "other treatment avenues." (Tr. 943). Thus the record does not reflect whether the additional treatment prescribed by Dr. Schloss, or his referral to another cardiologist, had any effect on the tachycardia symptoms that had increased just before Dr. Schloss's February 2012 assessment. (*See also* Tr. 22-23, noting the same, and "also no evidence of the need for acute medical care for her neurocardiagenic syncope" since the February 2012 appointment).

Plaintiff briefly references a lengthy list of impairments including chest wall pain from her pacemaker, chronic low back pain, headaches, neck pain, and alleged fibromyalgia pain which she alleges act in combination with her cardiac condition to preclude all work. Without repeating the ALJ's thorough discussion of the various alleged ailments, nearly all of which predated Plaintiff's departure from the workforce, the undersigned finds substantial evidence to support the conclusion that Plaintiff's

9

combination of impairments does not render her disabled.

### b. Dr. Schmidtgoessling

In addition to criticizing the ALJ's analysis of Dr. Schloss's opinions, Plaintiff asserts that the ALJ erred by giving greater weight to the opinions of non-examining psychological consultants than to the opinion of examining consultant, Nancy Schmidtgoessling, Ph.D. Dr. Schmidtgoessling examined Plaintiff on one occasion, on March 29, 2010.

Dr. Schmidtgoessling's narrative report states that Plaintiff indicated she received outpatient counseling many years ago, but no other mental health treatment, despite allegedly worsening symptoms from "social anxiety, panic attacks." (Tr. 455). During the clinical interview, Plaintiff appeared to be only "mildly depressed," although she reported her depression as a "4 to 5" on a 10 point scale, with "10 being severe." Plaintiff reported a long history of depression since her youth, with some attempts at suicide when she was younger, long before her alleged onset of disability. (Tr. 456). With respect to her anxiety, Plaintiff reported six panic attacks in the past month, but even more (almost-daily) panic attacks while she was still working. (Tr. 457). Dr. Schmidtgoessling noted that Plaintiff "did not show signs of anxiety during the session," despite her report of anxiety as a serious problem, rating it as a "6" at the time of the interview. (Tr. 457).

Dr. Schmidtgoessling's report reflects mostly normal findings, with normal mental thought content, no unrealistic concern about bodily functioning, and normal sensorium and cognitive functioning upon examination. (Tr. 457). Dr. Schmidtgoessling further noted Plaintiff's activities of daily living included caring for her two young children,[1]

---

[1] At the time of Plaintiff's examination, her two younger children were ages 2 and 9 months. Plaintiff also

10

cooking, washing dishes, sweeping, cleaning bathrooms and doing laundry, although some chores were alleged to be difficult due to physical limitations. (Tr. 458). Plaintiff testified similarly at the hearing that she performs those household chores, and cuts the grass with a riding mower twice a month. (Tr. 59). Plaintiff also reported enjoying reading "when I have time," and that she "can stay with [a really good book] for hours," and socializes with a friend and family members. (Tr. 458). Nevertheless, Plaintiff told Dr. Schmidtgoessling that her depression interferes with her ability to care for her children, and that typically 8 to 10 days a month she cannot get of bed to take care of them. (*Id.*). Based on that report, Dr. Schmidtgoessling diagnosed "moderate" major depression, panic disorder, social phobia, post-traumatic stress disorder in remission, and general anxiety disorder, with a GAF score of only 47. Dr. Schmidtgoessling opined that Plaintiff is "mildly" impaired in her ability to understand, remember and follow instructions, but "markedly" impaired in both her ability to maintain attention and concentration, persistence and pace to perform simple, repetitive tasks, and in her ability to relate to others including co-workers and supervisors. She further indicated that Plaintiff is markedly impaired in her ability to tolerate the normal stress and pressures of work activity. (Tr. 459).

Had the ALJ accepted Dr. Schmidtgoessling's opinions concerning the multiple areas in which she believed Plaintiff was markedly impaired, the ALJ would have found Plaintiff to be disabled. Instead, the ALJ gave "little weight" to Dr. Schmidtgoessling's opinions. The ALJ pointed out the discrepancies between the "generally unremarkable" consulting exam, including Plaintiff's reported ability to independently perform many

---

reported to Dr. Schmidtgoessling that she attended activities at school for her two older teenage children, and that she could drive an hour at a time. (Tr. 458).

11

daily activities, care for her young children, and interact regularly with friends and family, as contrasted with Plaintiff's report that she had significant problems with social anxiety, panic attacks and depression. (Tr. 23). Likewise, the ALJ noted the disconnect between the psychologist's observation that Plaintiff appeared only "mildly" depressed, was cooperative and displayed no signs of anxiety, and Dr. Schmidtgoessling's opinion that her depression and anxiety were so severe as to be disabling. (*Id.*).

The ALJ noted the complete lack of any psychiatric consultation, evaluation, hospitalization, counseling, therapy or other mental treatment, either before or after Dr. Schmidtgoessling's consulting examination through the date of the hearing. The ALJ further noted Plaintiff's own testimony that she has not sought such treatment or needed any acute treatment, and that no treating source has even recommended that Plaintiff seek treatment from a mental health professional. (Tr. 23). In fact, at the hearing Plaintiff testified that so long as she takes her Xanax, which she admitted she sometimes forgot to take, she did not have any anxiety attacks. (Tr. 53). Plaintiff additionally testified that her depression medication "pretty much works" despite some 'breakthrough depression." (Tr. 53; *see also* Tr. 68, testifying that "Cymbalta works pretty good."). The ALJ reasoned, "[h]er alleged mental health symptoms are inconsistent with the lack of any mental health treatment during the relevant period as well as her overall functional capabilities as described throughout the decision." (Tr. 24).

In addition to the guidelines applicable to the evaluation of the opinions of treating physicians, the regulatory framework provides guidelines for the evaluation of the opinions of consulting physicians. In general, the opinions of a consulting physician who has actually examined the plaintiff will be given more weight than that of a non-

12

examining consultant, although only treating physicians are entitled to controlling weight. *See* 20 C.F.R. §404.1527(c)(1) and (c)(2). However, these regulatory presumptions remain subject to individual variations. Thus, in *Blakley* the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances, opinions from State agency medical...consultants...may be entitled to greater weight than the opinions of treating or examining sources." (*Blakley*, 581 F.3d at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). In this case the ALJ credited the opinions of two non-examining consultants who had access to <u>all</u> of Plaintiff's records, including Dr. Schmidtgoessling's March 2010 report. By contrast, there was no indication that Dr. Schmidtgoessling had been able to review any of the claimant's prior medical records, and obviously, Dr. Schmidtgoessling did not review records that post-dated her consulting exam. (Tr. 26).

Plaintiff argues that the ALJ erred by failing to consider that Dr. Schmidtgoessling took all of the findings of her clinical interview into account when assessing Plaintiff with "marked" impairments. She asserts that the fact that she could only recall 3 digits backward on testing supports Dr. Schmidtgoessling's finding that she was "markedly" impaired with maintaining concentration, attention, persistence or pace, notwithstanding Dr. Schmidtgoessling's observation in a different area of the same report that Plaintiff demonstrated "good effort, motivation, and persistence" during testing and that she had "adequate memory and concentration." (Tr. 26). However, as a reviewing psychologist pointed out, the "marked" impairment rating by Dr. Schmidtgoessling was also inconsistent with Plaintiff's report to Dr. Schmidtgoessling that she can "concentrate on a good book for hours." (Tr. 465).

Plaintiff further argues that the fact that Dr. Schmidtgoessling was able "to

13

examine Plaintiff in detail far outweighs any advantage the reviewing physicians had from reviewing older medical evidence." (Doc. 10 at 11). Yet *Blakley* clearly holds that it is proper in "appropriate circumstances" to give greater weight to the opinions of non-examining consultants over the opinions of examining consultants, and even, on occasion, over the opinion of a treating physician. Here, the ALJ gave good reasons for giving greater weight to the opinions of the two non-examining psychological consultants in this case than to the opinion of Dr. Schmidtgoessling. While Plaintiff offers a contrary interpretation of some of the same evidence, the ALJ's analysis is supported by substantial evidence in the record as a whole.

**2. Credibility Assessment**

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

Plaintiff argues that the ALJ erred by focusing too much on her daily activities, and on her prior ability to work full-time, in discounting her credibility. However, the undersigned finds no error in the ALJ's credibility analysis as a whole.

It is clear from reading the transcript of the hearing that the ALJ had concerns about the Plaintiff's credibility. His written opinion spells out numerous reasons for his

14

negative assessment besides her daily activities. Plaintiff claimed that bulging discs and fibromyalgia, as well as cardiac symptoms, depression and anxiety, result in pain so severe she is unable to move. (Tr. 21). She further claimed that she could not lift more than a gallon of milk, and can't sit, stand or walk more than a few minutes. (*Id.*).

However, the ALJ detailed a number of serious discrepancies that existed between Plaintiff's allegations of disabling pain and symptoms and the objective medical evidence, and noted that she had received only conservative treatment, namely medications, and remained largely "capable of independently performing daily activities as well as being the major caretaker for her two young children." (Tr. 24). At the time of the hearing, her children were only two and four years of age; therefore, even assuming that Plaintiff's mother-in-law assisted her in caring for them a couple of days per week, she remains their primary caregiver. (Tr. 55, testifying that she is their primary caregiver); *see also generally* 20 C.F.R. §404.1529(c)(3)(daily activities and history of treatment may be considered when assessing credibility). In addition to pointing out that few medical records and little treatment corroborated Plaintiff's testimony that she suffered from a disabling severity of tachycardia and near syncope, the ALJ noted the discrepancies between Plaintiff's testimony at the hearing for her reasons for quitting work, and other records in which she reported that she quit primarily due to the birth of her child. The ALJ additionally noted the lack of evidence "that the claimant even attempted to return to work following the birth of her child." (Tr. 22). Finally, as discussed, no physician ever referred Plaintiff for treatment from a mental health specialist and she never sought out such treatment despite also claiming to suffer from a disabling level of anxiety and depression. Thus, while the ALJ did take into account Plaintiff's daily activities, her daily activities were not the sole reason for the adverse

15

credibility finding, but were considered appropriately as one factor in a record that contains substantial evidence to support an adverse finding.

The ALJ's reference to Plaintiff's ability to work full-time prior to her alleged onset date – in context – also reflects no error. Plaintiff argues that consideration of her prior work should have been irrelevant, since her application is based upon the premise that her impairments worsened over time. However, the ALJ's analysis of her pre-onset activities focused on the numerous records that showed her condition had remained unchanged, contrary to her testimony of worsening symptoms. For example, he noted that her back condition appeared to be unchanged from 2004 through 2012 based on diagnostic images that showed only mild disc bulging with no evidence of stenosis or impingement. He also pointed to records that reflected her longstanding cardiac condition had not signficiantly worsened since 1999. It was in that context that he noted that from 1999 through 2007, "there is no indication that her back pain or cardiac condition significantly limited her ability to perform" work. Thus, the ALJ stated that "the record contains no evidence of cardiac care between March 2007 and April 2008," during the year following her resignation from employment, "as well as no evidence of other acute medical care related to her condition," and "no evidence of mental health care or reports of exacerbated anxiety symptoms during the period surrounding her alleged onset date." (Tr. 22). Based upon the undersigned's review of the record as a whole, I find no basis to disturb the ALJ's credibility finding in this case.

### III. Conclusion and Recommendation

For the reasons discussed above, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** and that this case should be **CLOSED**.

    *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

NANCY MEAD,                                                    Case No. 1:13-cv-920

        Plaintiff,                                  Barrett, J.

v.                                                            Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).